**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHELDON C. ENG, individually and on behalf of all others similarly situated, | Case No.: |
| | **CLASS ACTION COMPLAINT** |
| *Plaintiff,* | |
| | **JURY TRIAL DEMANDED** |
| v. | |
| WARNERMEDIA DIRECT, LLC (d/b/a "Max," f/k/a "HBO Max"), and WARNER BROS. DISCOVERY, INC., | |
| *Defendants.* | |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................. 1

PARTIES .......................................................................................................................... 3

JURISDICTION AND VENUE ....................................................................................... 3

FACTUAL AND LEGAL ALLEGATIONS.................................................................... 5

I.      History Of The VPPA And NYVCPA.................................................................. 5

II.     Defendant Warner Media is a Video Tape Service Provider............................... 7

III.    Defendant Warner Media Intentionally Disclosed Subscribers' Video Viewing
        History and PII to Third Parties ........................................................................ 9

        A.      Overview of Meta's Pixel ....................................................................... 11

        B.      Defendant Warner Media Intentionally Disclosed HBO Max Subscribers'
                PII and Video Viewing History to Meta ............................................... 12

IV.     Plaintiff And Class Members Are consumers that Did Not, And Could Not,
        Consent to Warner Media's Surreptitious Disclosure Practices ...................... 17

V.      Warner Media's Refusal to Arbitrate Plaintiff's Claims .................................. 18

        A.      Warner Media Compels Class Action Plaintiff to Arbitration Before the
                AAA........................................................................................................ 18

        B.      Notice of Intent to Arbitrate VPPA Claims Before AAA..................... 19

        C.      Warner Media Refuses to Arbitrate Claims Before the AAA, Causing the
                AAA to Decline Claimants' Demands for Arbitration ......................... 21

CLASS ALLEGATIONS ............................................................................................... 22

LIMITATIONS AND TOLLING................................................................................... 25

COUNT I Violation of the Video Privacy Protection Act of 1988 (18 U.S.C. § 2710) (On
        behalf of Plaintiff and the Class Against Warner Media)................................. 26

COUNT II Violation of New York Video Consumer Protection Act (N.Y. Gen. Bus. Law
        §§ 670-75) (On behalf of Plaintiff and the Class Against Warner Media)...... 28

COUNT III Violation of New York's Uniform Deceptive Trade Practices Act (N.Y. Gen.
        Bus. Law § 349) (On Behalf of Plaintiff and the Class Against Warner Media) ............ 31

COUNT IV Unjust Enrichment (New York Common Law) (On Behalf of Plaintiff and
the Class Against Warner Media) ..................................................................................... 33

PRAYER FOR RELIEF ............................................................................................................. 34

DEMAND FOR JURY TRIAL .................................................................................................. 35

Plaintiff Sheldon C. Eng ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), by and through their undersigned attorneys, bring this class action against Defendants WarnerMedia Direct, LLC (d/b/a "Max," f/k/a "HBO Max") ("Warner Media") and Warner Bros. Discovery, Inc. (together, "Defendants") based on personal knowledge, where applicable, information and belief, and the investigation of counsel.

## <u>INTRODUCTION</u>

1.      Warner Media owns and operates a subscription-based video streaming service that was, until recently, called "HBO Max" (now known as "Max"), which offers a library of films, television series, and other pre-recorded video content to subscribers.  Warner Media is a wholly-owned subsidiary of Warner Bros. Discovery, Inc.

2.      Plaintiff brings this class action for damages and other remedies for harm suffered as a result of Defendants' illegal actions.  Unbeknownst to Plaintiff, Defendants knowingly disclosed his personally identifiable information ("PII") along with records of his video viewing history to third-party Meta Platforms, Inc. f/k/a "Facebook, Inc." ("Meta").  Plaintiff did not know of or consent to Defendants' surreptitious data sharing with Meta.  Defendants' illicit data sharing is a direct violation of the Video Privacy Protection Act of 1988, 18 U.S.C. § 2710 (the "VPPA"); the New York Video Consumer Protection Act, N.Y. Gen. Bus. Law §§ 670-75 (the "NYVCPA"); and New York's Consumer Protection from Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349 ("GBL 349").

3.      The VPPA provides a private, civil cause of action against a "video tape service provider" for "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider" without that consumer's consent.  *See* 18 U.S.C. § 2710(b).  The NYVCPA provides similar protections as the VPPA, and violations of the VPPA and NYVCPA constitute deceptive acts under GBL 349.

4. Warner Media knowingly and intentionally installed computer code known as the Meta tracking pixel ("Pixel") on HBO Max's website, which was accessible through web browsers (the "HBO Max Website"). As a result of this intentional conduct, when subscribers watched a video on the HBO Max Website, Warner Media, through the Pixel, disclosed subscribers' Facebook IDs and video viewing histories to Meta. Courts have repeatedly held that disclosure of this type of information, through a pixel, by a video tape service provider, constitutes a VPPA violation.

5. In 2023, Defendants (through its affiliate, Home Box Office, Inc.) compelled a class action (for alleged violations under the VPPA) to arbitration before the American Arbitration Association ("AAA"). *See McDaniel v. Home Box Office, Inc.*, 2023 WL 1069849, *1 (SDNY Jan. 27, 2023); Exhibit A at 36, *McDaniel v. Home Box Office, Inc.*, No. 1:22-cv-1942 (S.D.N.Y. April 29, 2022), ECF No. 19-1 (designating AAA).

6. However, when a substantial number of subscribers, including Plaintiff, began to provide Defendants notice of intent to pursue individual VPPA claims against Defendants in arbitration before the AAA pursuant to the arbitration clause (the "AAA Arbitration Clause") contained in the HBO Max Terms of Use (last updated November 1, 2022, the "Terms"),[1] Warner Media abruptly changed course. Specifically, on December 20, 2022, Warner Media "updated" its arbitration clause to name National Arbitration and Mediation ("NAM") as the arbitral forum and add onerous pre-arbitration requirements, including that consumers represented by counsel communicate directly with Warner Media's counsel before filing arbitration demands and that consumers whose claims were unsuccessful would need to reimburse Warner Media for its attorneys' fees and costs (the "NAM Arbitration Clause," a part of the "New Terms"[2]). These

---

[1] Attached hereto as Exhibit A.
[2] Attached hereto as Exhibit B.

changes, which purported to apply retroactively to claims of which Defendants at the time were already on notice, are unenforceable and unconscionable.

7.    However, Plaintiff and Class Members in this case notified Defendants of their claims prior to the publication of the New Terms.  Therefore, the New Terms do not apply to Plaintiff's or Class Members' claims.

8.    Because Defendants have repudiated and breached the AAA Arbitration Clause (causing the AAA to decline to administer thousands of arbitration demands), and because the NAM Arbitration Clause is inapplicable to these disputes and unenforceable, Plaintiff now brings this class action seeking liquidated and other damages, as well as injunctive and declaratory relief.

## PARTIES

9.    Plaintiff Sheldon C. Eng is a natural person who resides in the State of California and maintained a Facebook account, subscribed to HBO Max, and watched pre-recorded videos on the HBO Max Website, prior to June 2022.  Plaintiff provided Warner Media his Notice of Claims on October 19, 2022, and ceased using HBO Max before December 20, 2022.  Plaintiff is a party to the Tolling Agreement (defined below).  On April 12, 2024, Plaintiff filed a Demand for Arbitration against Warner Media before the AAA.

10.    Defendant WarnerMedia Direct, LLC is a Delaware limited liability company headquartered at 30 Hudson Yards, New York, NY 10001.

11.    Defendant Warner Bros. Discovery, Inc. is a Delaware corporation headquartered at 230 Park Avenue South, New York, NY 10003.

## JURISDICTION AND VENUE

12.    This Court has federal-question subject-matter jurisdiction under 28 U.S.C. § 1331 over this action under the Video Privacy Protection Act, 18 U.S.C. § 2710.  This Court may exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's and Class Members'

NYVCPA, GBL 349, and unjust enrichment claims because these claims arise from a common nucleus of operative facts as their VPPA claims, relating to HBO's use of the Pixel to share Plaintiff's and Class Members' video viewing history without their consent.

13.    Alternatively, this Court also has subject-matter jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which: (1) there are at least 100 Class Members; (2) the combined claims of Class Members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendants and at least one Class Member are domiciled in different states.  Specifically, HBO Max was (and Max is) a popular, nationwide streaming service, resulting in at least thousands of Class Members. Additionally, with liquidated damages of $2,500 for each VPPA violation, $500 for each NYVCPA violation, and $50 for each GBL 349 violation, as well as restitution for Plaintiff's and Class Members' claim for unjust enrichment, Class Members' claims easily exceed $5,000,000. Finally, because HBO Max was (and Max is) a popular, nationwide streaming service, while Defendants are residents of New York and Delaware, so at least one Class Member is diverse from Defendants.

14.    This Court may exercise personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A), because Warner Media maintains its principal place of business in this District, at 30 Hudson Yards, New York, NY 10001, and Warner Bros. Discovery, Inc. and maintains its principal place of business in this District, at 230 Park Avenue South, New York, NY 10003; and because, on information and belief, Defendants' relevant misconduct, namely the integration of the Pixel into its software, occurred in this District.  Both the Terms and New Terms also stipulate that HBO consents to personal jurisdiction in this District.  *See* Terms § 5.9, at 46 ("A dispute that is not subject to arbitration under Section 5.4 (Dispute Resolution) of these Terms shall be brought

in the appropriate state or federal court located in New York County, New York; and we and you each irrevocably consent to the exclusive jurisdiction and venue of the state or federal courts in New York County, New York for the adjudication of all non-arbitral claims."); New Terms, § 5.10 at 28 ("Any dispute that is not subject to arbitration under Section 5.4 (Dispute Resolution) of the Agreement, or any issues involving arbitrability or enforcement of any provisions under Section 5.4 shall be brought in the appropriate state or federal court located in New York County, New York, and we and you each irrevocably consent to the exclusive jurisdiction and venue of the state or federal courts in New York County, New York for the adjudication of all non-arbitral claims.").

15.     Venue is proper is this District pursuant to 28 U.S.C. § 1391(b)(1), because Defendants maintain their principal place of business in the State of New York. Venue is also proper is this District pursuant to 28 U.S.C. § 1391(b)(2), because, on information and belief, a substantial part of the events giving rise to this action, namely the development of the HBO Max Website's software and its use of the Pixel, occurred in this District. Additionally, as explained *supra*, the Terms and New Terms both provide for venue in this District for claims not subject to arbitration. *See* Terms, § 5.9; New Terms, § 5.10.

## FACTUAL AND LEGAL ALLEGATIONS

### I.     HISTORY OF THE VPPA AND NYVCPA

16.     The VPPA was passed after President Ronald Reagan's nomination of Judge Robert H. Bork to the United States Supreme Court. The impetus for the legislation occurred when a movie rental store disclosed the nominee's family's rental history to the Washington City Paper, which then published that history. Congress responded by passing the VPPA in 1998, with an eye toward the digital future. On the August 4, 1988 legislative hearing of the Senate Judiciary Subcommittee on Technology and the Law and the House Judiciary Subcommittee on Courts,

Civil Liberties, and the Administration of Justice, Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. No. 100-599, at 5-6 (1988) (internal ellipses and brackets omitted).

17.    The late Senator Paul Simon further noted that, "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes. These records are a window into our loves, likes, and dislikes." *Id.* at 6-7. Senator Leahy also remarked that, "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id.* at 7.

18.    While these statements rang true in 1988 when the Act was passed, the VPPA is even more relevant now in the digital modern computing era. During the January 31, 2012 Senate Judiciary Committee hearing, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century,"[3] Senator Leahy emphasized this point, saying that, "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[4]

---

[3] *The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century,* Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law (Jan. 31, 2012), https://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century .
[4] Statement of The Honorable Patrick Leahy at 1 (January 31, 2012), https://www.judiciary.senate.gov/imo/media/doc/leahy_statement_01_31_12.pdf .

19.    Likewise, Senator Al Franken summed up the importance of the VPPA emphasizing: "[i]f someone wants to share what they watch, I want them to be able to do so… But I want to make sure that consumers have the right to easily control who finds out what they watch— and who doesn't.  The Video Privacy Protection Act guarantees them that right."[5]

20.    In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones."   S. Rep. 112-258 (2012), at 2.

21.    The VPPA provides a private right of action against "[a] video tape service provider who knowingly discloses, to any person, [PII] concerning any consumer of such provider."  18 U.S.C. § 2710(b).

22.    In 2014, New York State enacted a statute modeled after the VPPA, known as the Video Consumer Protection Act ("VCPA"), N.Y. Gen. Bus. Law §§ 670-75, under which Plaintiff here also bring a claim.  The elements of the VCPA are substantially similar (and in some cases, identical) to the elements of the VPPA.

## II.    DEFENDANT WARNER MEDIA IS A VIDEO TAPE SERVICE PROVIDER

23.    A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials."  18 U.S.C. § 2710(a)(4).

24.    Max (f/k/a "HBO Max"), owned and operated by Warner Media, is one of the oldest subscription television services in the U.S., offering, amongst other things, pre-recorded films, movies, and television programs to its subscribers.

---

[5] *Supra* note 1.

25.     In May 2020, Warner Media launched a streaming platform called HBO Max, which allowed consumers to subscribe to the platform to view its pre-recorded video content for a monthly fee.[6]  By June 30, 2021, Warner Media estimated that its HBO Max streaming platform reached approximately 43.6 million subscribers in the U.S.[7]

26.     In 2022, consumers could access HBO Max's streaming platform by: purchasing an ad free subscription for $14.99 per month or, starting in June 2022, by purchasing an ad supported subscription for $9.99 per month.[8]  Today, similar Max subscriptions cost $16.99 per month for a Standard plan without ads, $20.99 per month for a Premium plan without ads, and $9.99 per month for the Basic plan with ads.[9]

27.     Through its streaming platforms like Max and HBO Max, Warner Media is "engaged in the business" of providing, *i.e.*, "deliver[ing]," prerecorded TV shows and movies, which are "audio visual materials."  *See* 18 U.S.C. § 2710(a)(4).  Because these prerecorded TV shows and movies are filmed and edited across the U.S. and other nations and "deliver[ed]" through the internet and across the U.S. via Max/ HBO Max, Warner Media's business is "in or affecting interstate or foreign commerce."  *See id.*

---

[6] Kif Leswing, *HBO Max online service just launched in the U.S. — here's a first look*, CNBC (May 27, 2020), https://www.cnbc.com/2020/05/27/hbo-max-new-hbo-streaming-video-service-launches.html (noting that the monthly fee was $14.99 and that "[u]nlike other HBO apps, Max includes TV shows that initially aired on other networks and aren't available on competing services").

[7] *2ⁿᵈ Quarter Earnings 2021*, WarnerMedia at 11 (July 22, 2021) https://investors.att.com/~/media/Files/A/ATT-IR-V2/financial-reports/quarterly-earnings/2021/q221/2Q21_Trending_Schedule.pdf#page=11 (HBO Max having approximately 12.1 million direct consumer accounts in the U.S.. Another 31.5 million U.S. subscribers were able to access HBO Max as part of their regular HBO subscription, making the total potential subscribers 43.6 million.)

[8] Jordan Valinsky, *HBO Max raises prices for the first time*, CNN (January 12, 2023) https://www.cnn.com/2023/01/12/media/hbo-max-price-hikes/index.html.

[9] *Choose Your Plan*, Max, https://auth.max.com/product (last visited Mar. 25, 2025).

III.    **DEFENDANT WARNER MEDIA INTENTIONALLY DISCLOSED SUBSCRIBERS' VIDEO VIEWING HISTORY AND PII TO THIRD PARTIES**

28.    Unbeknownst to Plaintiff and Class Members, Warner Media knowingly and intentionally disclosed its subscribers' PII along with their video viewing history (or a record of every video every viewed by the subscriber) to third-party, Meta.

29.    Warner Media caused this surreptitious transmission of subscribers' PII—protected by the VPPA and VCPA—to Meta by embedding the Pixel into the HBO Max Website.

30.    PII includes "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider," and which should not be shared without the consumer having expressly given consent in a standalone consent form.  18 U.S.C. § 2710(a)(3); N.Y. Gen. Bus. Law § 672(3).

31.    PII comes in many forms and is routinely found to be personally identifiable where unique strings of characters designate a specific individual or associated account.  This includes: (i) name; (ii) social security number; and (iii) email address.[10]  Courts and experts routinely find that an ordinary person can use an email address to uniquely identify another person because many publicly available services offer email reidentification offerings, even where the emails are in hashed form.[11]

---

[10] *See* Allison Schiff, *Can Email Be The Next Big Online Identifier?,* AdExchanger (August 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII"); *2020 NAI Code of Conduct,* Network Advertising Initiative (2020) at 19, https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf *(identifying email as PII); United States v. Hastie, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of 'information that identifies an individual.' They can 'prove' or 'establish the identity of' an individual.") (citation omitted)*; *see, e.g.*, BEENVERIFIED, www.beenverified.com (offering "Email Lookup" and promising to "provide users access to billions of records from leading sources") (last visited Feb. 28, 2025).
[11] Ed Felten, *Does Hashing Make Data "Anonymous"*?, Federal Trade Commission (April 22, 2012), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique . . . the casual assumption that hashing is sufficient to anonymize data is risky at best, and usually wrong.") (emphasis added); No, *Hashing Still Doesn't Making Your Data Anonymous*, Federal Trade Commission (July 24, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous ("[H]ashes aren't 'anonymous' and can still be used to identify users,

32.    Like email addresses, many user account IDs and Customer IDs are considered PII. Customer IDs are unique strings of numbers associated with particular consumers.  Customer IDs are sent to advertisers and other third parties to allow third parties to track user activity across various websites, apps, platforms, and devices. These identifiers attach to devices and generally cannot be changed. Using publicly available resources, a Customer ID can track a user's movements, habits, and activity on mobile applications.[12]  Put together with other information, a Customer ID serves as "the passport for aggregating all of the data about a user in one place."[13]

33.    Because a Customer ID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading and viewing preferences. These inferences, combined with publicly available tools, make Customer IDs identifiers that sufficiently permit an ordinary person to identify a specific individual, and thus, they constitute PII for the purposes of the VPPA and NYVCPA.

34.    Here, Warner Media transmitted subscribers' Facebook ID, a personally identifiable Customer ID, along with subscribers' video viewing history.

35.    A Facebook ID is a unique and persistent identification number that Meta assigns to each Facebook user when they create and register an account.

36.    Meta defines the Facebook "User ID" as a "string of numbers" that connects to users' "Facebook profile."  The Facebook User ID is assigned "automatically, whether or not you

---

and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized.").

[12] Thomas Tamblyn, *You Can Effectively Track Anyone, Anywhere Just By The Adverts They Receive*, HUFFPOST (Oct. 19, 2017), https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5.

[13] Willie Boag, *Trend Report: Apps Oversharing Your Advertising ID*, IDAC, https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/ (last visited Feb. 28, 2025).

choose to create a username."  Meta states that "someone with the [User] ID [can] see your profile."[14]

37.    Meta requires users to enter their first names, last names, and gender to create a profile.  Meta also encourages users to include additional PII, like photographs, location, email, and phone numbers, on their profiles.

38.    An ordinary person who knows a Facebook user's Facebook User ID can easily look up the Facebook user's Facebook profile by appending the Facebook User ID to free, publicly available databases.[15]

39.    This means that, like Customer IDs, Facebook User IDs are identifiers that sufficiently permit an ordinary person to identify a specific individual, and thus, constitute PII for the purposes of the VPPA and NYVCPA.

A.    **Overview of Meta's Pixel**

40.    Meta is best known as a social media company that operates social media platforms Facebook and Instagram.

41.    Meta also operates a vast advertising business in which Meta offers advertising space on its social media platforms for sale to various companies.  In connection with this advertising business, Meta develops and offers a variety of "business tools" that provide companies with free website and mobile application ("app") development tools.  By using these free tools, companies gain access to marketing analytics and insights about their user base.

42.    Meta's business tools allow implementing companies, like Warner Media, to surreptitiously gather and share PII about their users in order to personally identify each user and

---

[14] *How usernames and user IDs are used on Facebook profiles*, Facebook
https://www.facebook.com/help/211813265517027 (last visited Feb. 28, 2025).
[15] *See Your Username*, Facebook https://www.facebook.com/help/1740158369563165/ (last visited Mar. 26, 2025).

their interests.  This allows companies to tailor advertisements precisely to individuals.  Meta then generates revenue by making advertising space available for sale on its social media platform.

43.     The Pixel is one example of Meta's many business tools.  The Pixel is an invisible tool that Meta makes available to website developers, like those employed by Warner Media, free of charge.

44.     Unbeknownst to users, companies, like Warner Media, can embed the Pixel—a string of computer code—into their websites to collect specific information about consumers.

45.     In exchange for the free use of its Pixel tool, Meta automatically receives user data from the website in which the Pixel is embedded.

46.     Warner Media intentionally incorporated and maintained the Pixel in the HBO Max Website.

**B.     Defendant Warner Media Intentionally Disclosed HBO Max Subscribers' PII and Video Viewing History to Meta**

47.     Warner Media strategically chose to integrate Meta's business tool trackers into the HBO Max Website with the intent to use the analytics information generated by Meta, to improve its marketing and customer outreach, thereby generating a higher revenue for Warner Media and its related entities.

48.     Because Warner Media chose to incorporate Meta's Pixel into its HBO Max Website, Meta automatically received: (i) the name of each video viewed by a subscriber; and (ii) the subscriber's identifying Facebook User ID.

49.     Warner Media disclosed the name of each video viewed in the form of a URL for each video, which includes the name of the video appearing on the webpage viewed, and the Facebook ID of an individual user.

50.     Warner Media chose to embed Meta's Pixel and disclose subscribers' information to Meta for its own financial benefit.

51.     Warner Media tracks video content subscribers view on the HBO Max Website by capturing two events: "Page View" and "AuthenticatedTraffic."  Through the "PageView," Warner Media discloses to Meta the URL the subscriber accessed, which identifies the specific video viewed.  Moreover, the second event, "AuthenticatedTraffic," transmitted the episode title, series name, season title, episode number, and title.  Thus, event data from PageView and AuthenticatedTraffic, both jointly and independently, are sufficient to permit an ordinary person to identify a particular video's title and content, either in the data or by opening the URL in the browser.

52.     Warner Media, through the Pixel, compelled browsers to submit cookies to Meta, including the c_user cookie, which contained subscribers' Facebook ID.

53.     The "c_user" cookie, or Facebook ID, is a unique identifier of the Facebook user currently logged onto Facebook on the browser.

54.     When a visitor's browser had recently logged out of Facebook, HBO Max compelled the browser to send a smaller set of cookies that could still identify the user and link the user to the user's Facebook account through Facebook ID.

55.     Warner Media also disclosed identifiers through Meta's "Automatic Advanced Matching."[16]  When activated, Automatic Advanced Matching ensures "[t]he Meta Pixel will automatically look for recognizable form fields and other sources on the website that contain information such as first name, surname, and email address.  The Meta Pixel receives information

---

[16] *How We Built a Meta Pixel Inspector*, The Markup (April 28, 2022) https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector#advanced-matching-parameters.

entered in these fields along with the event, or action, that took place."[17]   Meta used this information to better match visitors to their Facebook profiles, which in turn allowed HBO Max to better target its advertisements.[18]

56.     As with Meta's "Business Tools", Warner Media uploaded customer lists and offline events subscribers to their Facebook profiles.

57.     Meta was able to use personal information provided through the Meta Pixel, such as name, email address, gender, address, or birthdate to connect event data to a Facebook account.[19]

58.     Warner Media combined these customer lists with offline event data to effectively target subscribers through a process identified by Meta as "conversion tracking."

59.     Meta notified potential business customers, like Warner Media, that "tracked conversions . . . can be used to analyze the effectiveness of your [ads] and to calculate your return on ad investment."[20]   Meta also noted that "tracked conversions [can be] used to define custom audiences for ad optimization."  These custom audiences can then be used send targeted ads.[21]

60.     Meta instructed businesses seeking to make use of offline event data to upload a dataset of customer information that could then be matched to a Facebook profile.[22]

61.     The dataset must contain "customer details" such as "name, email address, and phone number,"[23] that Meta then matches to a user's Facebook profile.[24]

62.     Meta stated that this information would be hashed during upload.

---

[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Conversion Tracking*, Meta https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/  (last visited Feb. 28, 2025).
[21] *Supra* note 13.
[22] *Id.*
[23]                 *Upload          offline         event          data*,          Meta
https://www.facebook.com/business/help/155437961572700?id=565900110447546  (last visited Feb. 28, 2025).
[24]*Supra* note 13.

63.     Meta was able to match HBO Max users' information to existing data Meta had amassed from its social media platforms without subscribers' knowledge.  There are a number of commonly used methods to decrypt hashed emails including, for instance, a "dictionary attack."[25]

64.     Meta combined these customer lists with offline event data to effectively target subscribers.  When advertisers create an ad campaign, Meta will "match the offline data [they] upload to the dataset set so that [they] can see how much [their] ads resulted in offline activity."[26]

65.     Meta also recommended that advertisers, like WarnerMedia, provide an accurate timestamp for each event, down to "the minute or second,"[27] as shown below.



66.     Meta provided subscribers the ability to pull reports for "Audience-based advertising," which showed what advertisers are targeting ads "based on your information or

---

[25] *SHA256 Encrypt/Decrypt*, 100L5, https://10015.io/tools/sha256-encrypt-decrypt#google_vignette (last visited Feb. 28, 2025) (defining dictionary attacks as "[u]s[ing] a predefined list or database").
[26] *Supra* note 20.
[27] *Id.*

activity off-Meta technologies."[28]    As depicted below, Warner Media utilized Meta's "Business Tools" by uploading list data to match their subscribers with their video viewing history.

 

67.    Moreover, Warner Media was not sharing anonymized, non-personally identifiable data with Meta.  To the contrary, Warner Media disclosed its unique identifiers that track specific Facebook users.  Importantly, the recipient of the personal viewing history—Meta—received it as a single data point it can then match to other data gathered on a specific subscriber.  WarnerMedia has thus monetized HBO Max subscriber PII by disclosing subscriber viewing histories to Meta in a manner allowing them to make a direct connection without the consent of its subscribers and to the detriment of legally protected consumer privacy rights.

68.    The VPPA defines PII as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  Accordingly, a Facebook ID is PII, and, by installing the Pixel on the HBO Max Website, Warner Media arranged to disclose Plaintiff's and Class Members' PII to Meta systematically.

---

[28] *Settings you can manage across your accounts in an Accounts Center*, Meta https://www.meta.com/help/accounts-center/1894490827562393/  (last visited Feb. 28, 2025).

69.     Warner Media could have easily programmed the HBO Max Website to prevent its automatic disclosure of Plaintiff's and Class Members' PII to Meta when they view video content. Yet, Warner Media continued to utilize the Pixel technology and reap the benefits of its marketing analytics offerings.

70.     Given the prevalence and sophistication of data analytics tools in the past decade since the VPPA was amended, Warner Media cannot deny knowledge of how these technologies work.

## IV.  PLAINTIFF AND CLASS MEMBERS ARE CONSUMERS THAT DID NOT, AND COULD NOT, CONSENT TO WARNER MEDIA'S SURREPTITIOUS DISCLOSURE PRACTICES

71.     A "consumer" is "any renter, purchaser, or subscriber of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1). Plaintiff and Class Members are "subscribers[s]" and therefore "consumer[s]" as contemplated by the VPPA because Plaintiff and Class Members purchased HBO Max subscription plans by providing their personal information (*i.e.*, first name, last name, and email) and payment details to subscribe and view pre-recorded video content.

72.     Plaintiff and Class Members did not consent to Warner Media's disclosure of their PII and video viewing history.

73.     The VPPA and NYVCPA require Warner Media to obtain informed, written consent from consumers before disclosing their video viewing history and PII to third parties, like Meta.

74.     Specifically, the VPPA limits video tape service providers' ability to share consumers' PII with third parties, except where consumers provide "***informed, written consent*** (including through an electronic means using the internet) . . . in a form that is distinct and separate from any form setting forth other legal or financial obligations of the consumers."  18 U.S.C.

2710(b)(2)(B) (emphasis added).  In other words, the VPPA requires affirmative consent through a form separate from a company's generic privacy policy.

75.    Such consent must be at the election of consumers, and consumers must be clearly and conspicuously provided with an opportunity to withdraw consent from ongoing disclosures. *Id.*

76.    Warner Media did not present HBO Max subscribers with a separate written consent form to share video watching histories nor were Plaintiff and Class Members given the opportunity to withdraw consent from ongoing disclosures.

77.    To the extent information about Warner Media's data sharing practices could be located within Warner Media's generic privacy policy, the language (i) was not presented to Plaintiff or Class Members in a transparent manner; (ii) was not made available as part of the sign-up process; and (iii) was not offered to Plaintiff or Class Members as checkbox or e-signature field, or as any form of affirmative consent.

78.    Warner Media violated the "informed, written consent" requirement because Warner Media (1) never received consent for the disclosures in "a form distinct and separate," from its privacy policy, (2) did not limit its disclosures to two years, and (3) did not provide its subscribers with an election to opt-in to share subscribers' PII with Meta.

## V.    WARNER MEDIA'S REFUSAL TO ARBITRATE PLAINTIFF'S CLAIMS

### A.    Warner Media Compels Class Action Plaintiff to Arbitration Before the AAA

79.    By subscribing to HBO Max's services, Warner Media required Plaintiff and Class Members to agree to its Terms (last updated November 1, 2022).  The Terms contained the AAA Arbitration Clause.

80.     After two HBO Max subscribers filed a putative class action against Defendants under the VPPA on March 8, 2022, Defendants successfully moved to compel arbitration of their claims before AAA and dismissed the action.  *See McDaniel*, 2023 WL 1069849, *1, *4 (compelling arbitration); Exhibit A at 36, *McDaniel v. Home Box Office, Inc.*, No. 1:22-cv-1942 (S.D.N.Y. April 29, 2022), ECF No. 19-1 (designating AAA).

**B.     Notice of Intent to Arbitrate VPPA Claims Before AAA**

81.     While Defendants' Motion to Compel Arbitration and Dismiss Claims were Pending, a large number of HBO Max Subscribers Notified Defendants of their Intent to Arbitrate VPPA Claims Before the AAA, then WarnerMedia Changed its Arbitration Clause, and Certain HBO Max Subscribers Executed a Tolling Agreement with Defendants

82.     Following Defendants' motion to compel arbitration in *McDaniel*, HBO Max subscribers began to retain counsel, including undersigned counsel, to pursue claims under the VPPA and similar state laws against Defendants in arbitration.

83.     Because the Terms required pre-arbitration written notice of disputes, *see* Terms, § 5.4(b), undersigned counsel provided written notice to Warner Media on October 19, 2022 of 5,631 individuals' intent to pursue VPPA and state law claims against Warner Media. On December 9, 2022, undersigned counsel provided another notice of additional 25,382 individuals' intent to pursue arbitration against Warner Media before the AAA, based on the same violations of the VPPA and state laws.

84.     After those two notices—as well as, on information and belief, similar notice letters from other claimants' counsel— Warner Media purported to replace its Terms with the New Terms, beginning on December 20, 2022.  Upon information and belief, Warner Media did so in response to claimants' intent to pursue arbitration against Warner Media regarding the VPPA and

state law claims described in the written notices and repeated in this Complaint, as well as the *McDaniel* complaint.

85.     Though the New Terms are unenforceable for a number of reasons, this class action concerns only Plaintiff and Class Members who provided notice of claims to Warner Media on December 20, 2022 prior to the publication of the New Terms.

86.     In January 2023, undersigned counsel—on behalf of the individuals who had already provided notice to Warner Media and "the individuals to be noticed by January 30, 2023,"—entered into a Tolling and Reservation of Rights Agreement (the "Tolling Agreement")[29] with "WarnerMedia Direct, LLC and Home Box Office Inc. and each of their respective parents, subsidiaries, and affiliates."

87.     The Tolling Agreement provided:

> The Parties covenant and agree that the Tolling Period shall not be included in calculating any statute of limitations, statute of repose or other time-related defense, whether statutory, contractual or otherwise, and whether at law, in equity, or otherwise (including, but not limited to, the doctrines of waiver, laches, acquiescence or estoppel) that might be applicable to any claims of any type in law or equity that the Tolling Claimants may file against the Tolling Respondent based on, arising out of, or relating to, directly or indirectly, the Tolled Claims.

Tolling Agreement at 2.

88.     Additionally, as contemplated by the Tolling Agreement, undersigned counsel provided another list of claimants on January 30, 2023 to Warner Media.

89.     The Tolling Agreement defined the "Tolling Period" to extend "through and including thirty (30) days after the date of the mediation."  The parties ultimately participated in

---

[29] Attached hereto as Exhibit C.

four unsuccessful mediations, on May 31, 2023, August 16, 2023, December 8, 2023, and on February 8, 2024, each time agreeing to extend the Tolling Period.[30]

   C.    **Warner Media Refuses to Arbitrate Claims Before the AAA, Causing the AAA to Decline Claimants' Demands for Arbitration**

   90.    On April 12, 2024, 8,541 individuals, including Plaintiff and other Class Members, filed arbitration demands against Warner Media before the AAA through undersigned counsel, alleging violations of the VPPA and state law.[31]

   91.    In response, the AAA "acknowledge[d] receipt" of the demands but explained: "Prior to the filing of these arbitrations, WarnerMedia Direct, LLC failed to comply with the AAA's policies regarding consumer claims."[32] Specifically, AAA noted: "Under R-12 of the Consumer Rules, businesses that provide for AAA arbitration in a consumer contract must submit their current or proposed consumer agreements to the AAA for review and inclusion on the Consumer Clause Registry," and that "[i]n order for the AAA to proceed with administration, WarnerMedia Direct, LLC must register its clause on the Registry." *Id.* The AAA added: "We ask that the business register its clause by **April 22, 2024**. If the business does not comply, the AAA will decline to proceed. Pursuant to R-1 (d) of the Consumer Arbitration Rules, should the AAA decline to administer an arbitration, either party may choose to submit its dispute to the appropriate court for resolution." *Id.* (emphasis in original).

   92.    Warner Media declined to register the AAA Arbitration Clause with the AAA. Accordingly, the AAA closed all of the pending arbitrations.

---

[30] *See* email chain between counsel for Plaintiff and counsel for Defendants regarding ongoing mediation, attached hereto as Exhibit D.
[31] *See, e.g.,* Plaintiff's Demand for Arbitration filed with the AAA, attached hereto as Exhibit E.
[32] *See* Letter from AAA dated April 15, 2024, attached hereto as Exhibit F.

93.     By declining to register the AAA Arbitration Clause with the AAA and refusing to arbitrate before the AAA, Warner Media breached the AAA Arbitration Clause with respect to the individuals who had filed demands and anticipatorily breached and repudiated it with respect to Plaintiff and Class Members.

## CLASS ALLEGATIONS

94.     Plaintiff, on behalf of all others similarly situated, brings this class action under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), and/or (c)(4) as representatives of the following Class:

> All persons in the United States who had Facebook accounts, subscribed to HBO Max, and viewed prerecorded video content on the HBO Max Website in a browser on a computer, tablet, or mobile device, all prior to June 2022 ("Class Period"); provided notice of their claims to Warner Media through undersigned counsel on either October 19, 2022 or December 9, 2022; and entered into a tolling agreement with Warner Media through undersigned counsel.

95.     Excluded from the Class are:

a)      any individual who provided notice of an intent to file a demand for arbitration or filed a demand for arbitration against Defendants, alleging substantially similar allegations as the ones contained herein, through any firm other than undersigned counsel Labaton Keller Sucharow LLP, unless such other firm has subsequently notified both such individual and Defendants that it has withdrawn from that representation and such individual has elected not continue to arbitrate *pro se*;

b)      any individual who has settled claims against Defendants based on substantially similar allegations as the ones contained herein;

c)      any Judge or Magistrate presiding over this action and any members of their immediate families;

     d)     Defendants, Defendants' subsidiaries, affiliates, parents, successors, predecessors, and any entity in which Defendants or its parents have a controlling interest and their current or former employees, officers, and directors; and

     e)     Plaintiff's counsel, Defendants' counsel, or any counsel representing any individual described in subparagraph (a) of this paragraph above with respect to claims described in subparagraph (a) of this paragraph above.

96.     Plaintiff reserves the right to modify, change, or expand the Class definition or to define subclasses based upon discovery and further investigation.

97.     **Numerosity**: The Class consists of thousands of individuals, making joinder impractical.

98.     **Commonality and Predominance**: Common questions of law and fact exist with regard to each of the claims and predominate over questions affecting only individual Class Members.  Questions common to the Class include, but are not limited to:

     a)     Whether Defendants obtained and shared, or caused to be obtained and shared, Plaintiff's and Class Members' PII;

     b)     Whether Defendants' disclosures were committed knowingly;

     c)     Whether Defendants disclosed Plaintiff's and Class Members' personal information as a result of Defendants' conduct described herein;

     d)     Whether Defendants' use and disclosure of Plaintiff's and Class Members' PII and video viewing history was without their consent or authorization;

     e)     Whether Defendants' conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710;

f)    Whether Defendants' conduct violates N.Y. Gen. Bus. Law § 349;

g)    Whether Defendants' conduct violates New York Video Consumer Privacy Act, N.Y. Gen. Bus. Law § 670, *et seq.*;

h)    Whether Defendants' acquisition and transmission of Plaintiff's and Class Members' PII resulted in harm;

i)    Whether Defendants breached and repudiated the AAA Arbitration Clause;

j)    Whether the Plaintiff's and Class Members' claims are timely under the applicable limitations period, including through the doctrines of fraudulent concealment, equitable tolling, and contractual tolling; and

k)    Whether Defendants should be enjoined from engaging in such conduct in the future.

99.    **Typicality**: Plaintiff's claims are typical of the claims of Class Members in that Plaintiff, like all Class Members, have been injured by Warner Media's misconduct—disclosing subscribers' PII and viewing content to third parties without obtaining consent. Moreover, if Defendants seek dismissal based on the statute of limitations, Plaintiff's arguments for fraudulent concealment, equitable tolling, and contractual tolling will be typical of the Class Members.

100.    **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff have retained counsel with substantial experience in prosecuting complex litigation and class actions, including data privacy and consumer protection cases. Plaintiff does not have any interests antagonistic to those of the Class. Though Plaintiff and Class Members had previously retained the same counsel in pursuing their arbitration demands against Warner Media, Warner Media refused to register the AAA Arbitration Clause with the AAA, resulting in the AAA closing those arbitration, and stating that Plaintiff and Class Members

are free to pursue their claims in court, as they now are.  Accordingly, this past representation poses no issue that could affect the adequacy of counsel's representation.

101.    **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Class-wide damages are essential to induce Defendants to comply with federal and state law.  Moreover, because the amount of each individual Class Member's claim is small relative to the complexity of the litigation, Defendants' financial resources, and the unenforceable arbitration agreement, Class Members are unlikely to pursue legal redress individually in court for the violations detailed in this Complaint.  A class action will allow these claims to be heard in court where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.  Moreover, Warner Media has repudiated the AAA Arbitration Clause, which had previously purported an alternative to a class action, by refusing to register with the AAA or arbitrate before the AAA, resulting in the AAA closing those arbitrations.

102.    **Injunctive relief**: Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the Class as a whole.

## LIMITATIONS AND TOLLING

103.    The Pixel was hidden within complex code and was not disclosed in Warner Media's privacy policies or the Terms.  Thus, the earliest date reasonable consumers, such as Plaintiff and Class Members, could have discovered Warner Media's violations of the VPPA, the NYVCPA, and GBL 349, was March 9, 2022, when the *McDaniel* class action was filed and revealed, through a sophisticated analysis of Warner Media's code, the presence of the Pixel. Moreover, because Warner Media hid its use of the Pixel and failed to disclose it, the doctrine of

fraudulent concealment tolls any claims by Plaintiff and Class Members against Defendants concerning the Pixel that accrued prior to March 9, 2022 until March 9, 2022.

104.    Each day after March 9, 2022 that the Pixel remained active on the HBO Max Website and transmitted data to Meta, new claims accrued on behalf of Plaintiff and Class Members against Defendants.

105.    Because Plaintiff and Class Members were members of the putative class in *McDaniel*, they could have reasonably understood that the *McDaniel* plaintiff were pursuing claims on their behalf against Defendants diligently.  However, because Defendants compelled the *McDaniel* plaintiff to arbitration without any serious intent to arbitrate substantial numbers of VPPA cases before the AAA, Defendants effectively prevented Plaintiff's and Class Members' claims from advancing in either the *McDaniel* class action or in arbitrations before the AAA. Therefore, all Plaintiff and Class Members claims were subject to equitable tolling at least from the filing of the *McDaniel* complaint until the *McDaniel* resolution.  Additionally, the claims of Plaintiff and those Class Members who provided contractually mandated notice of claims to Warner Media and/or filed arbitration demands with the AAA are subject to equitable tolling during those notice periods and while their demands were pending fruitlessly before the AAA.

106.    Additionally, the Plaintiff's and Class Members' claims were subject to additional, contractual tolling during the pendency of the Tolling Agreement, as extended in writing by email. *See* Tolling Agreement; Exhibit D.

**COUNT I**
**Violation of the Video Privacy Protection Act of 1988**
**(18 U.S.C. § 2710)**
**(On behalf of Plaintiff and the Class Against Warner Media)**

107.    Plaintiff re-alleges and incorporates by reference all allegations in this Complaint as if fully set forth herein.

108.    Warner Media is a "video tape service provider" as defined by the VPPA because they "engage in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio- v i s u a l  materials." 18 U.S.C. § 2710(a)(4).  Warner Media provided via HBO Max (and provides via Max) prerecorded video content to consumers.

109.    Under the VPPA, Plaintiff and Class Members were "subscriber[s]" of "goods or services from a video tape service provider," namely Warner Media.  *See* 18 U.S.C. § 2710(a)(1).  Therefore, Plaintiff and Class Members are "consumers" as defined by the VPPA.  18 U.S.C. § 2710(a)(1).

110.    Under the VPPA, the term "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).

111.    The information disclosed by Plaintiff and Class Members constitute "personally identifiable information" in this context because it personally identifies consumers like Plaintiff and Class Members.

112.    Warner Media shared and disclosed Plaintiff's and Class Members' PII to third parties, like Meta.

113.    Warner Media's transmissions of Plaintiff's and Class Members' PII to Meta are "knowing[] disclosures" of "personally identifiable information" of a person as proscribed by the VPPA.  18 U.S.C. § 2710(a)(1).

114.    Plaintiff and Class Members did not provide Warner Media with any form of consent— either written or otherwise—to share or disclose their PII to Meta.

115.    Warner Media's disclosures to Meta were not made in the "ordinary course of business" as the term is defined by the VPPA.   In particular, Warner Media's disclosures to Meta were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."   18 U.S.C. § 2710(a)(2).

116.    Warner Media violated the VPPA each time it disclosed Plaintiff's and Class Members' PII to Meta, entitling Plaintiff and each Class Member to statutory damages of no less than $2,500 per violation.

117.    While Plaintiff and Class Members are not required to have suffered actual damages to receive an award of statutory damages under the VPPA, Plaintiff and Class Members suffered actual harm, in that Plaintiff and Class Members paid money to subscribe to HBO Max in return for Warner Media's promise to keep Plaintiff's and Class Members' PII confidential. Warner Media breached these promises.

118.    Plaintiff and the Class seek: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the Class's interests by requiring Warner Media to comply with the VPPA's requirements for protecting a consumer's PII; (3) statutory damages of no less than $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (4) reasonable attorneys' fees and costs and other litigation expenses.

### COUNT II
**Violation of New York Video Consumer Protection Act**
**(N.Y. Gen. Bus. Law §§ 670-75)**
**(On behalf of Plaintiff and the Class Against Warner Media)**

119.    Plaintiff re-alleges and incorporates by reference all allegations in the Complaint as if fully set forth herein.

120.    The NYVCPA  prohibits the wrongful disclosure of video tape rental records, and states that "[a] video tape service provider who knowingly discloses, to any person, personally

identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided in § 675 of this article."  N.Y. Gen. Bus. Law § 673.

121.    By subscribing to HBO Max and watching video content through the HBO Max Website, Plaintiff and Class Members are "consumer[s]" who rented, purchased, and subscribed to goods or services from a "video tape service provider or video tape seller" like Warner Media. N.Y. Gen. Bus. Law § 672.

122.    Warner Media is a "video tape service provider" because it "engages in the business of rental of prerecorded video cassette tapes or similar audiovisual materials[,]" N.Y. Gen. Bus. Law § 672(4), including the prerecorded videos that Plaintiff and Class Members viewed through the HBO Max Website, which that are similar to prerecorded video cassette tapes and those deliveries affect interstate or foreign commerce.

123.    "Personally identifiable information" is "information that identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  N.Y. Gen. Bus. Law § 672(3).

124.    Warner Media knowingly caused Plaintiff's and Class Members' video viewing information, as well as their PII, to be disclosed to Meta via the Pixel.  This information constitutes "personally identifiable information" under the NYVCPA because it personally identifies consumers like Plaintiff and Class Members to Meta as an individual who obtained specific video materials or services from Warner Media through the HBO Max Website.  On information and belief, this information allowed Meta to identify Plaintiff's and Class Members' specific individual video viewing preferences and habits.

125.    As set forth in NYVCPA § 672(6), "informed, written consent" must be (1) "in writing in at least ten point bold face type, affixed to any membership, subscriber or rental

agreement between the consumer and the video tape service provider, and shall be posted on a sign in full and clear view of the consumer at the point of rental transaction;" and (2) be drafted to include the language provided by the NYVCPA . Warner Media failed to obtain informed, written consent from Plaintiff and Class Members under this definition.

126.    On information and belief, Warner Media was aware that the Pixel collects personally identifiable information about HBO Max subscribers like Plaintiff and Class Members and sends that information to Meta. On information and belief, Warner Media was also aware that Plaintiff's and Class Members' personal viewing history was disclosed to Meta because it incorporated the Pixel into the HBO Max Website knowing that Meta would receive video titles or video IDs and the subscriber's unique identifiers (*i.e.* Facebook ID) when a subscriber watched prerecorded video. The purpose of these transmissions was to obtain identifiable analytics and intelligence for Warner Media about its subscribers.

127.    Plaintiff and Class Members have been injured for violations of N.Y. Gen. Bus. Law § 673(5) and seek damages of no less than $500 for each violation, regardless of the actual amount of damages proved, plus reasonable attorneys' fees and costs and other litigation expenses.

128.    As a result of the above violations, Warner Media is liable to Plaintiff and Class Members for actual damages related to their loss of privacy in an amount to be determined at arbitration or, alternatively for "not less than five hundred dollars in damages, regardless of the amount of actual damage proved[.]" N.Y. Gen. Bus. Law § 675(1).

129.    Thus, Plaintiff and the Class seek (1) an injunction requiring Warner Media to obtain consent from consumers prior to the disclosures of their PII and video viewing history and information; (2) statutory damages of no less than $500 per violation; and (3) reasonable attorneys' fees and costs and other litigation expenses pursuant to N.Y. Gen. Bus. Law § 675.

**COUNT III**
**Violation of New York's Uniform Deceptive Trade Practices Act**
**(N.Y. Gen. Bus. Law § 349)**
**(On Behalf of Plaintiff and the Class Against Warner Media)**

130.    Plaintiff re-alleges and incorporates by reference all allegations in the Complaint as if fully set forth herein.

131.    GBL 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." GBL § 349(a).

132.    As consumers of Warner Media's services, Plaintiff and Class Members are "person[s]" within the meaning of GBL 349.

133.    Plaintiff is authorized to bring a private action under GBL 349(h).

134.    Warner Media conducted business, trade, or commerce, in the State of New York.

135.    Plaintiff and Class Members viewed Warner Media's videos in connection with transactions in "business," "trade," or "commerce" within the meaning of GBL 349.

136.    This Count is brought for Warner Media's deceptive conduct, including its unlawful and deceptive acts related to Warner Media's: (a) omissions of disclosures required under the VPPA, the NYVCPA, and GBL 349 for the sharing of PII and video viewing history; (b) failure to disclose its practice of sharing Plaintiff's and Class Members' PII and video viewing histories to third parties, revealing the identity of individuals who watched specific videos.

137.    Warner Media systematically engaged in these deceptive, misleading, and unlawful acts and practices to the detriment of Plaintiff and Class Members.

138.    Warner Media willfully engaged in such acts and practices and knew or acted in reckless disregard for whether it violated GBL 349.

139.    Warner Media's representations and omissions were material because HBO Max subscribers, including Plaintiff and Class Members, would not have used Warner Media's services,

or would have paid less for such services, had they known that Warner Media would disclose Plaintiff's and Class Members' PII and video viewing histories that could be associated with their individual identity, without Plaintiff's or the Class Members' knowledge or consent, to third parties.

140.    Plaintiff and Class Members relied on Warner Media's deceptive representations and omissions when they subscribed to Warner Media's products and services.

141.    Plaintiff and Class Members had no way of knowing Warner Media secretly disclosed Plaintiff's and Class Members' PII and video viewing histories in such a way that the video viewing history could be associated with their individual identity, without Plaintiff's or the Class Members' knowledge or consent, to third parties.

142.    Plaintiff and Class Members have been injured as a direct and proximate result of Warner Media's violations as they would not have purchased, or would have paid significantly less for, Warner Media's services, had they known that their PII and video viewing histories would be shared in such a way that the video viewing history could be associated with their individual identity, without Plaintiff's or the Class Members' knowledge or consent, to third parties.

143.    The unfair and deceptive acts and practices by Warner Media alleged herein were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Plaintiff and Class Members that they could not have reasonably avoided.  This substantial injury outweighed any benefits to consumers or to competition.  Plaintiff and Class Members seek all monetary and non-monetary relief allowed under GBL 349, including actual damages or statutory damages of $50 per violation, whichever is greater, treble damages, injunctive relief, and attorneys' fees and costs.

## COUNT IV
### Unjust Enrichment
### (New York Common Law)
### (On Behalf of Plaintiff and the Class Against Warner Media)

144.    Plaintiff re-alleges and incorporates by reference all allegations in this Complaint, as if fully set forth herein.

145.    Warner Media received benefitted from Plaintiff and Class Members and unjustly retained those benefits at their expense.

146.    Warner Media received benefits from Plaintiff and Class Members in the form of the Plaintiff's and Class Members' highly valuable data, including their PII and video viewing history, that Warner Media wrongfully disclosed to third parties without authorization and proper compensation.  Warner Media's retention of these ill-gotten gains is unjust and inequitable.

147.    Warner Media disclosed and used Plaintiff's and Class Members' data for its own gain, providing Warner Media with economic, intangible, and other benefits, including highly valuable data for analytics, advertising, and improvement of their platforms, algorithms, and advertising services.

148.    Had Plaintiff or Class Members known of Warner Media's misconduct, they would not have provided any of their data to Warner Media or have used or paid to use HBO Max.

149.    Warner Media unjustly retained these benefits at the expense of Plaintiff and Class Members because Warner Media's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

150.    The benefits that Warner Media derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members.  It would be inequitable under unjust enrichment principles in the State of New York and every other state for Warner Media to be permitted to retain any of

the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

151.    Warner Media should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members for all unlawful or inequitable proceeds that Warner Media received, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, pray for relief and judgment from this Court against Defendants as follows:

1.    Certify this case as a class action, and appoint Plaintiff as Class Representative and the undersigned attorneys as Class Counsel;

2.    Declare that Defendants' actions, as set forth above, violate the VPPA, the NYVCPA, and GBL 349;

3.    Award Plaintiff and the Class statutory damages of $2,500 for each VPPA violation;

4.    Award Plaintiff and the Class statutory damages of $500 for each NYVCPA violation;

5.    Award Plaintiff and the Class statutory damages of $50 for each GBL 349 violation;

6.    Award restitution and disgorgement in the measure of Defendants' unjust enrichment at the expense of Plaintiff and Class Members;

7.    Award Plaintiff and the Class compensatory, actual, treble, punitive, nominal, and other damages;

8.    Award Plaintiff and the Class reasonable attorneys' fees, costs, and other litigation expenses, pursuant to 18 U.S.C. §2710(c)(2)(C), N.Y. Gen. Bus. Law §§ 349(h), 675, and other applicable laws;

9.    Award injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including, *inter alia*, an order requiring Defendants to comply with the VPPA, the NYVCPA, and GBL 349;

10.    Award Plaintiff and the Class such other and further relief as equity and justice the Court deems proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues triable as of right.

Dated: March 26, 2025                    Respectfully submitted,

By: */s/ Michael P. Canty*
Michael P. Canty
Carol C. Villegas
Danielle Izzo
Gloria J. Medina
Michael Hotz
**LABATON KELLER SUCHAROW LLP**
140 Broadway, 34th Floor
New York, NY  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
cvillegas@labaton.com
dizzo@labaton.com
gmedina@labaton.com
mhotz@labaton.com

*Attorneys for Plaintiff and the Proposed Class*